| | | | |
|---|---|---|---|
| **WILLIAM CARAWAN, JR.,** | ) | | |
| | ) | | |
| **Plaintiff,** | ) | | |
| | ) | | |
| **vs.** | ) | **ORDER** | |
| | ) | | |
| **FNU MITCHELL, et al.,** | ) | | |
| | ) | | |
| **Defendants.** | ) | | |
| | ) | | |

**THIS MATTER** comes before the Court on Defendants FNU Lee, FNU Mitchell, and FNU Williams' Amended Motion for Summary Judgment, (Doc. No. 43). [1]

## I. BACKGROUND

*Pro se* incarcerated Plaintiff's Amended Complaint passed initial review on violations of the First Amendment, Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Due Process Clause. Defendants Horne and the Unidentified Unit Manager were never served; Defendant Tillman was served but has not filed an Answer or otherwise appeared in this case. The remaining Defendants have filed an Amended Motion for Summary Judgment, (Doc. No. 43), that is presently pending before the Court for consideration. In Plaintiff's Response, he asks for reconsideration of his previous request for the appointment of counsel and he also asks the Court to liberally construe his Response as a cross Motion for Summary Judgment.

**(1)** **Amended Complaint** (Doc. No. 13)

---

[1] Defendants Lee, Mitchell, and Williams filed a Motion for Summary Judgment on May 10, 2019, (Doc. No. 42), and filed an Amended Motion for Summary Judgment that same day, (Doc. No. 43). The Court will grant the Motion to Amend and will proceed on the Amended Motion for Summary Judgment.

Plaintiff alleges that prison Superintendent Mitchell imposed a rule, enforced by Defendants Horne, Lee, Tillman, and Williams, that is contradictory to the North Carolina Department of Public Safety blanket policy regarding books and legal materials. The rule required Plaintiff, upon entering segregation on February 28, 2015, to surrender all books except for **six books** that are considered legal materials. (Doc. No. 13 at 3). Plaintiff was not given the less severe option of storing the books rather than having them mailed to a relative, where they never arrived.

Plaintiff practices Islam sincerely and believes that he is required to seek knowledge as part of his faith. His rights were substantially burdened when all his religious books were taken and the only religious materials that remained accessible to him were Christian materials. The confiscation of books prevented Plaintiff from learning in accordance with his religion and there were no other means of reading about Islam of which Plaintiff was aware. The deprivation of Plaintiff's books caused an atypical and significant hardship by requiring him to relinquish his religious books so that he could keep his legal books which he needed to litigate pending and future claims. Defendants did not confirm the legal materials as such, according to NCDPS policy and procedures, which show he is able to possess at least six religious books. If he had been able to keep six legal books pursuant to policy, he would have also been able to keep six religious books and only three would have been stored or mailed out. Had Plaintiff been given due process, the dispute about his legal materials would have been referred to the Department of Prisons director. Should Plaintiff seek compensation through a tort claim, it would be fruitless due to *res judicata*.

Plaintiff seeks reimbursement for the books that were confiscated, and compensatory, punitive, and nominal damages. He argues that relief should not be deemed moot because he is likely to be shipped back to Lanesboro C.I. in future. (Doc. No. 13 at 4).

**(2)**   **Defendants' Motion for Summary Judgment** (Doc. No. 43)

Defendants Lee, Mitchell, and Williams argue that summary judgment should be granted because no genuine issue of material fact exists, and that they are entitled to judgment as a matter of law.

They argue that Plaintiff has failed to demonstrate the existence of a genuine issue of material fact that the conduct he complains of is substantially burdensome to the exercise of his religion. NCDPS policies and procedures and the Lanesboro SOP related to inmate personal property and state property were not promulgated with any intent to discriminate against Plaintiff or his religious faith and are necessary to maintain the safety of the inmates and officers at the facility. The Lanesboro SOP places specific limits on the amount of personal property that an inmate may possess while confined at Lanesboro to ensure that inmates are able to safely secure their personal items and reduce fire and sanitation hazards. The policy places restrictions on religious exercise but does not pressure the adherent to violate his religious beliefs or abandon the precepts of his religion and is not a substantial burden. Plaintiff cannot show by competent evidence that he was directed to either mail or destroy his religious and legal books. Even if Plaintiff possessed religious books in excess of the Lanesboro SOP limits on February 28, 2015, the restriction was promulgated for inmate safety and security and was not a substantial burden. The personal property policies are valid and reasonably related to legitimate penological interests. Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact showing that Defendants acted with the requisite intent as required under RLUIPA.

Plaintiff's claims that he was denied access to the courts must be dismissed because Plaintiff has failed to show an actual adverse legal result and, therefore, he suffered no constitutional injury. Further, he cannot provide sufficient evidence of Defendants' intent to deliberately deprive him of legal materials or of their direct knowledge of any pending legal matter

and their intent to hinder his efforts.

Plaintiff cannot proceed on claims against Defendant Mitchell on theories of *respondeat superior* or supervisory liability. Taken in the light most favorable to Plaintiff, Defendant Mitchell was not directly involved in the February 28, 2015 packing and documentation of Plaintiff's move to the segregation unit. At most, Plaintiff alleges that Defendant Mitchell was responsible for creating the applicable Lanesboro SOP. To the extent that Plaintiff is proceeding against Defendant Mitchell on a theory of supervisory liability, he fails to state such a claim because the allegations fail to show that Defendant Mitchell had knowledge of a pervasive and unreasonable risk of constitutional injury to Plaintiff.

Plaintiff's claims for injunctive and declaratory relief are moot because Plaintiff was transferred away from Lanesboro on August 18, 2016 and any official capacity claims for monetary damages are barred by the Eleventh Amendment.

Further, Defendants are entitled to qualified immunity on Plaintiff's claims for damages against them in their individual capacities because Plaintiff has failed to demonstrate a constitutional violation or show that Defendants acted intentionally. Defendants acted neutrally in carrying out the applicable policies and procedures and Plaintiff cannot demonstrate that they took any action to deprive him of the ability to worship his faith, impair his access to the courts, or out of ill-will or animus towards him. Plaintiff has not demonstrated any compensable damages for the alleged First Amendment violation aside from possibly asserting emotional distress or mental anguish.

**(3)     Plaintiff's Response**

Plaintiff was informed of the importance of responding to Defendants' motion as well as the legal standard applicable to summary judgment motions and was granted an extension of time

to respond. <u>See</u> (Doc. No. 46-48).

Plaintiff requests reconsideration of the denial of his Motion for the Appointment of Counsel, (Doc. No. 50 at 1), arguing that he is a layman, has no access to the internet or a law library. He asks the Court to liberally construe the Response as a cross Motion for Summary Judgment. (Doc. No. 50 at 1-2). He also requests that a copy of his materials be sent back to him because he does not have access to the Court's electronic docket. (Doc. No. 50-1 at 1) (requesting Plaintiff's affidavit, Response, Statement of Material Fact, and Appendix).

Plaintiff argues that he was not allowed to possess or store his approved religious texts or legal texts as permitted by the prison SOP and NCDPS Policy and Procedures when he was put into segregation on February 28, 2015. He disputes Defendants' allegation that he received all of his property. Rather, he was required to send his books when he should have been allowed to store them on the unit. Defendants' actions were not reasonably related to a legitimate penological interest. He claims that he was deprived of all his religious books "in order to be able to keep his legal books…," which hindered his religious practice and access to the knowledge in the legal texts. (Doc. No. 50-2 at 12). Plaintiff's religious practice was burdened because he "was forced to violate his religious beliefs of seeking knowledge of Islam altogether." (Doc. No. 50-2 at 13). He claims that Defendant Williams' assertion that the property was left in Plaintiff's possession is not true; "Plaintiff never had the contents in his possession mentioned in Williams' affidavit because he was on the inside of a seg cell and the property was on the outside of it with the defendants." (Doc. No. 50-2 at 13). Plaintiff's affidavit and DC-160 form indicate did not, and could not, have all of his personal property in the segregation cell. Plaintiff identified books to be sent out by mail, the books sat in Mrs. Green's office the entire time he was in segregation while she was out of work, and the books were still in Green's office on March 25, 2015. (Doc. No. 50-2 at 13).

Plaintiff did not have his property inventoried again until October 10, 2015. "The defendant didn't follow the protocol for handling property upon plaintiff arriving to segregation and it allowed for the misrepresentation of plaintiff's property left in his possession." (Doc. No. 50-2 at 13-14). Plaintiff "cannot fathom how safety of the inmates or officers in the facility would be jeopardized or compromised by the same amount of property being allowed in a segregation cell as is allowed in regular population cells." (Doc. No. 50-2 at 14). The policies, which provide that Plaintiff be allowed to retain or store his legal and religious text and that he be allowed two personal books, are not the least restrictive means of furthering a governmental interest. Defendants knew about the policy that permitted Plaintiff to have his legal texts stored and to retain his religious texts, and he was supposed to be able to request access to his stored property every 30 days. The fact that he was made to relinquish the items that were supposed to be stored shows that "there had to be intent on the minds of defendants." (Doc. No. 50-2 at 15). The record does not show that Defendant was provided a DC-160 of the amount of property he was actually allowed to keep in his segregation cell, which "create[ed] an intentional tort as it did cause plaintiff physical damage." (Doc. No. 50-2 at 15). Defendants' policies should not be deemed legitimate because they are contradictory, vague, ambiguous, and substantially burden Plaintiff's religious practice of obtaining religious knowledge.

Defendants' actions required Plaintiff to either forfeit his legal texts, to which he has a state-granted liberty interest to possess or have stored, and forfeit his religious texts, to which he has a state-granted liberty interest in retaining, or keep the religious texts and forego the legal texts that he used to litigate ongoing civil actions. Even if the books were received at the address to which they were allegedly mailed, Plaintiff cannot get them back without purchasing them from a publisher in accordance with policy. Policy provides that, if there is a doubt about whether an

inmate should be allowed to possess legal material, the Director of Prisons or his representative should be contacted and, in the case that the inmate cannot have the materials, they are to be stored. Plaintiff is not alleging violation of his access to the courts.

Plaintiff sincerely believes that his religion requires him to seek Islamic knowledge. Taking his books, which he was allowed to have pursuant to policy, restricted his religious exercise. He was forced to abandon Islamic education while he was in segregation, which violates his beliefs and forced him to abandon a precept of Islam. Defendants' facts are incomplete and inaccurate with regards to whether he was forced to mail books that he should have been allowed to keep.

Defendant Mitchell, as the authority who decides what policies are to be enforced at Lanesboro, had personal knowledge of, and involvement in, the creation of the policies and having his staff enforce them. The Lanesboro policy is unchanged even after Plaintiff notified Defendant Mitchell, which shows deliberate indifference. This case is not moot because Defendants allege that their actions are in accordance with NCDPS policies and Plaintiff is still subject to the NCDPS policies. Defendants should also be held accountable for their actions because they violated Plaintiff's rights, and it should not matter that it is no longer happening or that there are injuries besides physical injuries. Plaintiff suffered physical injury "to the extent that his personal property is permanently lost." (Doc. No. 50-2 at 19-20). Plaintiff is seeking damages as to the loss of the property in which he had a state-created interest and his transfer to another prison should not moot his case "as there are damages such as the cost of this action as well as that of the books." (Doc. No. 50-2 at 20).

Qualified immunity does not apply because Defendants' actions "were seeming to be intentional as they know the policies yet still stripped plaintiff of the legal and religious books and then trying to cover it up by 'losing' documents as well as perjury in affidavits stating that they

7

are unaware of property plaintiff was made to mail." (Doc. No. 50-2 at 20). Plaintiff cannot further support this argument due to lack of knowledge of the facts and law. However, it is "fathomable and highly plausible that no court has ever come across a situation like this pertaining to a Muslim in prison." (Doc. No. 50-2 at 21).

**(4)     Evidence[2]**

**(A)     Affidavit of William Rogers** (Doc. No. 45-1)

William Rogers is Assistant Superintendent V for Custody and Operations at Lanesboro C.I. He is familiar with NCDPS policies and procedures and is trained and experienced in the management of inmates like Plaintiff. He has access to the Offender Population Unified System ("OPUS"), an electronic database containing comprehensive inmate records as well as inmate correctional records, documentation, correspondence, grievances, and Lanesboro's SOP.

The Lanesboro Personal and State Property SOP states that all segregation inmates may retain approved religious items and the following personal items: two personal books, two magazines, and two library books.

At Lanesboro, the regular population cells are approximately eight feet two inches high, seven feet wide and eleven feet deep. To ensure that inmates are able to safely secure their personal items and reduce fire and sanitation hazards, the SOP placed specific limits on the amount of personal property that an inmate may possess while confined at Lanesboro.

On February 28, 2015, Plaintiff was confined in restrictive housing (administrative segregation) pending the investigation of a possible assault involving Plaintiff and two other inmates.

When offenders are assigned to be moved to the segregation unit, officers are instructed to

_____
[2] This section is not exhaustive.

pack the offender's property and escort the offender to the segregation unit. A DC-160 inmate personal property form is completed by staff and reviewed and signed by the offender.

Based on Roger's review of the documents, Plaintiff's personal property was packed by two staff members, one of whom was Defendant Williams, and documented it on a DC-160 form that was signed and dated by Plaintiff. The form shows that all of Plaintiff's property was left with him. (Doc. No. 45-1 at 4). Rogers searched all available Lanesboro records and documents and found no other documents related to any property that Plaintiff alleged was missing, mailed, donated, and/or destroyed during the process of packing up his property and moving him to the segregation unit on February 28, 2015. If property was to be confiscated by staff and mailed, it would indicate "M" for mailed, or "S" for stored in the "disposition" column. (Doc. No. 45-1 at 5).

NCDPS policies and procedures and the Lanesboro SOP related to inmate personal and state property were not promulgated with any intent to discriminate against Plaintiff or his religious faith but are "necessary to maintain the safety of the inmates and officers in the facility." (Doc. No. 45-1 at 5).

(B)    **Affidavit of Hannah Williams** (Doc. No. 45-2)

Defendant Williams is a correctional officer at Lanesboro. On February 28, 2015, Plaintiff was confined in restrictive housing pending an investigation into a possible assault in which he was involved. When Plaintiff was assigned to be moved to the segregation unit, Defendant Williams was instructed to pack Plaintiff's property and escort him to the segregation unit. Defendant Williams completed a DC-160 inmate personal property form that shows all personal property in Plaintiff's possession and its disposition. Plaintiff was afforded the opportunity to review the DC-160 form and sign it. The letter "I" that appears in the disposition column of the

form indicates that the property item was left in inmate's possession.

Defendant Williams has no personal knowledge of any property that was allegedly taken from Plaintiff on February 28 and no personal knowledge of any books that Plaintiff alleges he was forced to send home, donate, or destroy on that date. Defendant Williams did not give any directive to Plaintiff that he send home, donate, or destroy his books on February 28, 2015. Defendant Williams has no personal knowledge whether or not any books Plaintiff alleges that he mailed to a designated address during that time frame were received at that address.

Defendant Williams does not draft policies, create them or modify the policies of NCDPS or of Lanesboro. It is Defendant Williams' role to implement policies of NCDPS and of Lanesboro.

Defendant Williams denies that, in performing her duties as a correctional officer at Lanesboro, she violated any rights secured to Plaintiff under the laws of the State of North Carolina or of the Constitution or laws of the United States.

**(C)** **Affidavit of Plaintiff** (Doc. No. 50-4)

Plaintiff was placed in segregation on February 28, 2015 due to the investigation of a fight. On that date, Plaintiff's property "was packed up by Union unit officers McCoy and Williams … [and his] property was brought to [his] cell in segregation by Union unit officer Williams and Richmond officers Tillman, Lee, and Sgt. Horne." (Doc. No. 50-4). The tray door was opened and Plaintiff was presented with DC-160 forms (Plaintiff's Exhibits M, N, O, P). Plaintiff was "told to sign the DC-160s" by Williams and Tillman and Plaintiff began receiving the property he was allowed to keep from officer Williams as she and officers Tillman and Lee were sorting through it. Williams was giving Plaintiff "what appeared to be her choice of what books [he] could keep." (Doc. No. 50-4 at 2). Plaintiff "protested the fact that all [his] legal books were being taken … and **was given the option to change books out, which [he] did choosing [his] legal texts to possess**

10

causing a discrepancy in the DC-160 … and accounted for properly which was why [his] property was not mailed out as it was supposed to be….” (Doc. No. 50-4 at 2).

The usual protocol for property upon an inmate's transfer to segregation is for the sending unit to inventory the prisoner's collected property and DC-160 inventory forms and then the sending until officers get the inmate to sign the DC-160 once it gets to the unit, often without the inmate confirming the "totality of the property" due to being in a seg cell. (Doc. No. 50-4 at 2). The receiving officers in segregation units are then supposed to complete another DC-160 form on which the inmate's possessions and stored property is listed and the inmate signs both lines on the DC-160 for the property they have in their cell. This was not done on February 28, 2015 by segregation unit officers Lee, Tillman and Horne, and "left the possibility of plaintiff's property not being properly accounted for." (Doc. No. 50-4 at 3).

Although Defendants say they have submitted all available information pertaining to Plaintiff's personal property on February 28, 2015, Plaintiff has a copy of a DC-160 for that day and for the day when he was finally made to mail out the books on April 8, 2015. (Plaintiff's exhibit O); (Doc. No. 50-4 at 3).

According to NCDPS Policy and Procedures Manual Chapter G, Section .0200, the access to courts section (.0208) provides that an inmate may possess legal texts and materials consistent with division policies and procedures but such items will not be provided by the department. It was never told to Plaintiff, nor is it established in the record, that Defendants lacked sufficient storage space for Plaintiff's legal texts or religious books. Nor was Plaintiff given the option to store the books.

It is Plaintiff's experience that upon arriving at the segregation unit with a segregated prisoner's property, the prisoner signs the DC-160 form to verify the contents of his property

coming from the unit which they were moved from. The disposition of all that property is usually labeled as "I" to indicate that the property was left with the inmate. Then the officer who receives the inmate in segregation fills out another DC-160 in which the amount of property the inmate is allowed to possess is limited to comply with security, order, etc., and the property which the inmate is not allowed to possess in seg is stored. The receiving DC-160 was not done by segregation unit staff and none of Plaintiff's property was stored except for his electric razor and clippers; but even that was not done right.

Williams, a knowledgeable officer, allegedly left two tubes of toothpaste, one nail clipper, one razor, and 18 books in Plaintiff's possession in segregation contrary to SOP. (Doc. No. 50-4 at 5). Williams expressly denied having any knowledge of property taken from Plaintiff on February 28, 2015, of Plaintiff being forced to send books home, or giving any directive for Plaintiff to send home, donate, or destroy his books. However, Williams signed the DC-160 form listing Plaintiff's books and showing Plaintiff's mailing address. The disposition is listed as being in Plaintiff's possession and the razor and nail clippers being stored. Plaintiff reports this encounter in numerous request forms to Lanesboro staff.

Defendant Lee says he gave Plaintiff directive relating to his possession of books and other personal property, alleging that those directives were Lanesboro SOP. The directives given by Defendant Lee for Plaintiff to send home, donate or destroy his legal/religious books were not actually Lanesboro SOP pertaining to legal or religious texts belonging to segregated inmates. Plaintiff had a right per NCDPS policy to have his legal texts pertaining to ongoing cases stored if he could not possess them. Plaintiff also had a right to retain his religious reading material. Plaintiff had a right to have all other property listed on the DC-160 and stored in the inmate personal property storage room. NCDPS policy and Lanesboro SOP were violated, forcing Plaintiff to be

12

deprived of his legal books and all of his religious books, which deprived him of "all religious study." (Doc. No. 50-4 at 7).

Plaintiff was released from segregation on March 14, 2015 and was given back only his razor and nail clippers even though he diligently tried to procure the books all the way up until April 8, 2015 when he was forced to send those books out by mail by Sergeant Russell and Administrative Assistant Green. Those books were "withheld" from February 28, 2015 to April 8, 2015 and Plaintiff was not able to get them back. (Doc. No. 50-4 at 8).

Defendants admit that Plaintiff should have been permitted to retain his legal and religious books in their exhibits. Nothing established Plaintiff's property to be unauthorized property in any paperwork and nothing in the record shows that such an assertion should it be made by Defendants. Plaintiff has established with Defendant's policies that he was permitted to possess the books.

Plaintiff sincerely believes he is required that every Muslim "seek religious knowledge through the teachings of prophet Muhammad." (Doc. No. 50-4 at 9). Plaintiff was "unable to seek any religious knowledge due to his not having the religious material taken from him. Even with the attempts plaintiff made at getting religious knowledge sent to segregation from the religious library at LCI, plaintiff still couldn't gain religious knowledge." (Doc. No. 50-4 at 9). "Plaintiff's normal practices were to go from book to book but that behavior had to be modified on the count of the defendants not following their own policy of allowing me to possess the approved religious materials while [he] was in segregation. [Plaintiff] was compelled to violate [his] beliefs when [he] had to choose between [his] legal texts, which cost far more than the religious materials on the one hand, something [he] was permitted by policy to retain, or [his] religious books could be retained but [he would] have to send [his] legal texts, which policy also permitted [him] to have in [his] possession or store away, by force applied by the defendants who refused to abide by the policies

they were so knowledgeable about." (Doc. No. 50-4 at 9). The segregation cells are the same size as a regular population cells, if not larger, so the policy of only allowing prisoners to have two books because they came to segregation is not a legitimate penological interest especially when Plaintiff's books, eight of which were legal and eight of which were religious, and two of which were "common books" were supposed to be stored and not relinquished. (Doc. No. 50-4 at 10). Defendants should not have taken the books just because Plaintiff went to segregation. Legal and religious books were sent away "as a result of direct orders from, Sgt Horne, c/o Lee, c/o Williams and c/o Tillman." (Doc. No. 50-4 at 10). The blatant disregard for their own policies can clearly only be deemed intentional.

Plaintiff was not given the option to store his legal texts or religious texts on the unit while he was in segregation. Plaintiff's books were held for "over a month" and still not given back to him when he got out of segregation. (Doc. No. 50-4 at 11). Nothing in the record shows that Plaintiff possessed unauthorized property or listed any contraband on the DC-160 forms. Defendants did not mention anything about Plaintiff not having adequate personal storage space in his cell or in the prison itself, or that the property caused issues pertaining to security, safety, sanitation or fire hazard and the orderly operation of the prison facility. Plaintiff did not "randomly choose" to send away his expensive legal texts or his "sentimentally cherished religious books" which prevented his use of them and ultimately caused their loss. (Doc. No. 50-4 at 12). Plaintiff would have kept the books in his cell if Plaintiff had them.

Plaintiff was not given all the property indicated in the DC-160 because all of it did not come down to the segregation until. He did not receive his razor and nail clippers until March 16, 2015 but they were still listed as "I" for inmate rather than "S" for stored. (Doc. No. 50-4 at 12).

The fact that Plaintiff was sent away from Lanesboro does not change the fact that he was

"forcefully stripped of property which he has a state-granted liberty interest to according to the NCDPS blanket policy and the LCI SOP." (Doc. No. 50-4 at 11). Therefore, Plaintiff should be reimbursed for the cost of the property, for the loss of its enjoyment, and for the loss of liberty associated with it, and the costs of litigation ($350 filing fee). This case is not moot because he could be shipped to the "sending camp" at any time. (Doc. No. 50-4 at 11).

**(D)**     <u>**Time Line**</u>

10/29/14     <u>Transfer</u> to Lanesboro C.I. (Doc. No. 45-1 at 7)

2/28/15     <u>Control Action</u> Plaintiff placed on administrative segregation pending an investigation for a possible assault (Doc. No. 45-1 at 35)

    <u>DC-160 Personal Property Inventory</u> by S. McCoy, c/o Williams, signed by Plaintiff "w/o confirmation" of: Federal Rules of Evidence, disposition "I;" Brief Writing and Oral Argument, disposition "I;" Qu'ran, disposition "I" stricken through; A Treasury of Favorite Muslim Names, disposition "I" stricken through; The Signposts of the Propagated Samah, disposition "I" stricken through; The Nolde Qur'an, disposition "I" stricken through; Majamu'a Wazaif, disposition "I" (Doc. No. 50-5 at 132)

    <u>DC-160 Personal Property Inventory</u>: *Illegible;* signed by Plaintiff "w/o confirmation" (Doc. No. 50-5 at 14) (Plaintiff's Exhibit N)

    <u>DC-160 Personal Property Inventory</u>: *Illegible* (Doc. No. 50-5 at 13) (Plaintiff's Exhibit M)

3/5/15     <u>Inmate Request for Information</u> from Plaintiff to Richmond Unit Manager: "I was only allowed **8 books** by Sgt. Horne upon my arrival into seg. other than my legitimate legal papers. I don't think that all the books and other papers took over 2 cubic feet of space and **the c/os were trying to select what <u>they</u> wanted me to have,** leaving my law books out of what they wanted me to have. Policy does not limit us to 6 or 8 books and the staff should be made aware of that. I'd like to have the rest of my books in my cell b/c they are religious & educational materials that I need for spiritual and academic growth." (Doc. No. 50-5 at 1) (Plaintiff's Exhibit A)

3/16/15     <u>Inmate Request for Information</u> by Plaintiff to Mrs. McAllister, Lower Richmond: "On 2/28/15 I was taken to segregation from Union Unit. All my property was inventoried on the Union Unit but not on the Richmond Unit. I was forced to send **all but 8 of my books** home but was not given receipt of them being sent home. I

recently found out that I'm allowed to possess more books than I was told. C/o Williams (Union), c/o Tillman (Richmond) and Sgt. Horne (Richmond) all witnessed the fact that I wasn't given the books and I even put the address which the books were supposed to go to on the DC-160. All the lines were signed but I'm being told that staff on both units 'can't find' my books and my family informs me that they have not received the books. I want my books back or I need to be reimbursed for the books which did not get given to me. The books are: 1) A Treasury of Names; 2) A Pocket Noble Qur'an; (3) 2014 World Almanac Book of Facts; 4) Paralegal Practice and Procedure 4th Edition; 5) Webster's Arabic/English Dictionary; 6) The Glorious Qur'an w/Roman Transliteration; 7) The SignPosts of the Propagated Sunnah; 8) Writing to Win; 9) Reading the Qur'an; and 10) Majmua Wazaif." (Doc. No. 50-5 at 2) (Plaintiff's Exhibit B)

3/18/15    Inmate Request for Information by Plaintiff to Mrs. McAllister, Moore Unit: "I spoke with the Unit Mgr from Union, Mr. Hatley about my property and he says he hasn't seen that property which c/o Rushing advised me that you told her you gave the property to Mr. Hatley b/c of issues w/ the DC-160. That property was forced to be sent home, donated, or destroyed and wasn't allowed the amount that the policy allows. I need my books back or I need to be reimbursed for my property. I wrote you and carbon copied that request on 3/16/15 and didn't receive a response. Please advise me of the status of my property b/c my family has not received the property, which I verified the address for on the DC-160." (Doc. No. 50-5 at 3) (Plaintiff's Exhibit C)

Inmate Request for Information by Plaintiff to Mrs. Cole, Richmond Unit Manager: "On 2/28/15 I was taken to the hole. C/o Williams & McCoy packed my property on Union and when I got my property c/o Williams (Union), c/o Tillman (Lower Richmond) and Sgt Horne (Richmond) were all there and inmate Casey Thomas also witnessed it from Bravo 18 in seg. I was told by both officers that I could only have **8 books** and they tried to give me what they wanted me to have. **I made an issue about not being able to choose my books and was allowed to switch the books** but still forced to mail, donate or destroy a few books. Those books have not been received nor have I been notified of their destruction or donation. I put my family address on DC-160 and they have not been received by them. I want my books back or I want to be reimbursed for my books." (Doc. No. 50-5 at 4) (Plaintiff's Exhibit D)

3/19/15    Inmate Request for Information by Plaintiff to D. Houser Mailroom, Richmond Upper: "I need to know has there been any books been sent to the mailroom to be mailed home from the Richmond or Union Unit. If they are still there I need them back b/c I should have never been forced to send them off per policy. I need my books back and haven't been given the chance to verify if the books are there, nor have I approved their donation or destruction. (Doc. No. 50-5 at 5) (Plaintiff's Exhibit E)

| | |
|---|---|
| 3/23/15 | <u>Staff Response</u> to the 3/18/15 Request to McAllister: "I do not have anything to do with excess property. I only handle stored property. You need to contact the unit that took your property." (Doc. No. 50-5 at 3) (Plaintiff's Exhibit C)<br><br><u>Staff Response</u> to the 3/19/16 Request to Houser: "I don't have anything that was mailed out for you. Check with Ms. McAllister unit secretary." (Doc. No. 50-5 at 5) (Plaintiff's Exhibit E) |
| 3/24/15 | <u>Inmate Request for Information</u> by Plaintiff to Mr. **Mitchell** Superintendent, Upper Richmond Unit: "I need to know where my books are that were taken from me on 2/28/15, by the Lower Richmond staff. The mailroom report that they have not received them and I can't get a response otherwise from staff." (Doc. No. 50-5 at 6) (Plaintiff's Exhibit F) |
| 3/25/15 | <u>Staff Response</u> to the 3/24/15 Request to Mitchell, by Edith Fultz: "Your books are in Ms. Green's office and her office is locked. Upon her return, your books will be mailed or you can have your books donated to the Religious Library." (Doc. No. 50-5 at 6) (Plaintiff's Exhibit F) |
| 3/27/15 | <u>Inmate Request for Information</u> by Plaintiff to Superintendent **Mitchell**, Upper Richmond: "Mr. Mitchell, I had books taken from me that I should have been allowed to have when I got locked up on 2/28/15 in Lower Richmond. Sgt Horne and c/o Tillman of Richmond both told me that I am only allowed to have **8 books** and refused to let me have the 10 books that policy allows even after I told them both that policy says I'm allowed to have 10 books. I want to pick enough books in order to have my 10 books." (Doc. No. 50-5 at 7) (Plaintiff's Exhibit G)<br><br><u>Inmate Request for Information</u> by Plaintiff to Mrs. Green, Upper Richmond: "I need to speak with you before anything is done with my books taken on 2/28/15. Edith Fultz informed me that they were in your office waiting to be mailed. I am supposed to be able to have those books and I need those books. I was only allowed to keep **8 books** by Sgt Horne and c/o Tillman when policy clearly states I'm allowed to have 10 books. Please do not do anything with my books until I get to get my books out so I can have the appropriate amount per policy." (Doc. No. 50-5 at 8) (Plaintiff's Exhibit H) |
| 4/6/15 | <u>Inmate Request for Information</u> by Plaintiff to Superintendent Mitchell, Upper Richmond: "I've asked for my books ever[] since 2/28/15 and I've been given the runaround by all the staff that others say have my books. My people haven't received my books through the mail and I haven't approved destruction nor donation of them. Either give me my books back or reimburse me for my property that was lost. I only have 8 books and policy allows 10 books. I should be allowed 4 of those books at least." (Doc. No. 50-5 at 9) (Plaintiff's Exhibit I)<br><br><u>Inmate Request for Information</u> by Plaintiff to Mrs. Thompson, Mailroom, Upper |

Richmond: "I'm trying to find out if <u>any</u> packages have been mailed out in my name since Feb. 28, 2015. I had books taken from me but I wasn't given the chance to destroy or donate them if they weren't sent out." (Doc. No. 50-5 at 10) (Plaintiff's Exhibit J)

4/7/15      <u>Inmate Request for Information</u> by Plaintiff to D. Houser, Mailroom, Upper Richmond: "I need to know if any packages have come to the mailroom to be mailed form my name since 2/28/15? If so, what happened to the package?" (Doc. No. 50-5 at 11) (Plaintiff's Exhibit K)

     <u>Inmate Request for Information</u> by Plaintiff to Edith Fultz, Upper Richmond: "I need to know what happened to my books that were supposed to be mailed on 2/28/15 by Union or Richmond staff." (Doc. No. 50-5 at 12) (Plaintiff's Exhibit L)

4/8/15      <u>Staff Response</u> to Plaintiff's 4/6/15 Request to Mitchell by Edith Fultz: "I contacted Ms. Green. Your books are in her office. She informed me she will pack them up and have them mailed to the address of your choice today…." (Doc. No. 50-5 at 9) (Plaintiff's Exhibit I)

     <u>DC-160 Personal Property Inventory</u> mailed to Chris Allred: Paralegal Book, Small Qu'ran, Writing to Win, Arabic to English, 2014 Almanac World, Reading the Qu'ran, A Treasury of Favorite Muslim Names, Majmu A Mazail, Noble Qu'ran, Signpost of the Propagated Samahs (Doc. No. 50-5 at 15) (Exhibit O)

4/9/15      <u>Staff Response</u> to Plaintiff's 4/6/15 Request to Thompson: "You had a box come to the mailroom on 4/8/15 to Chris Allred that will be shipped out on 4/10/15." (Doc. No. 50-5 at 10)

5/25/15      <u>Administrative Remedy Procedure</u> (4865-15-1331) re transfer to segregation, denial of property including books; marked delayed 5/27/15 (Doc. No. 45-1 at 32)

8/5/15      <u>Administrative Remedy Procedure</u> (4865-15-1331) refiled, accepted 8/12/15 (Doc. No. 45-1 at 32)

8/28/15      <u>Step One Response</u> (4865-15-1331) "This is in reference to your step #1 grievance originally dated 5-25-15; refiled 8-5-15. In accordance with Lanesboro Standard Operating Procedures, inmates are not to possess more than twenty (20) picture, twenty (20) letters, and/or cards, six (6) magazines, and/or books at any one (1) time, to include Bibles and Qurans. If you are indigent, the cost to mail home excessive property will be paid by the Inmate Welfare Fund. No further action recommended." (Doc. No. 45-1 at 33)

9/22/15      <u>Step Two Response</u> (4865-15-1331) "In response to your grievance, the response provided in Step 1 appropriately address your concern. I recommend no further action." (Doc. No. 45-1 at 33)

| | |
|---|---|
| 10/10/15 | <u>DC-160 Personal Property Inventory</u> including 9 books, disposition "I" (Doc. No. 50-5 at 135) |
| 3/13/16 | <u>DC-160 Personal Property Inventory</u> including Webster Dictionary, Noble Qu'ran, Federal Rules of Civil Procedures, Baron's Law Dictionary, The Way Things Work, Prisoner's Self Help Litigation Manual, The Citebook, The Message of the Quran, Federal Rules of Evidence, Brief Writing and Oral Argument, Arabic Index Cards, Jailhouse Lawyer's Handbook (Doc. No. 50-5 at 136) |
| 4/25/16 | <u>Step Three Response</u> (4865-15-1331) "Inmate William Carawan filed this grievance on August 5, 201[5] at Lanesboro Correctional Institution complaining about staff mishandling his property. Staff responded that an investigation of inmate Carawan's concern revealed that there was no evidence presented to substantiate his allegations against staff. This examiner carefully reviewed the grievance and the response given by staff in the DC-410A response. From this review, I am convinced that staff has adequately addressed this inmate's grievance concerns. I adopt the facts found by the staff investigator. On this records, this inmate's allegations are insufficiently supported. Thus, this grievance is dismissed for lack of support." (Doc. No. 45-1 at 34) |
| 8/18/16 | <u>Transfer</u> to Tabor C.I. (Doc. No. 45-1 at 7) |

## II. LEGAL STANDARDS

### (1) <u>Summary Judgment</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)

(internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. Celotex, 477 U.S. at 324 ; Kipps v. Ewell, 538 F.2d 564, 566 (4th Cir. 1976); Fed. R. Civ. P. 56(e). However, a verified complaint, like the Amended Complaint that Plaintiff filed, is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991); Davis v. Zahradnick, 600 F.2d 458, 459–60 (4th Cir. 1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment).

**(2)**     **First Amendment & RLUIPA**

The First Amendment of the Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment. <u>See</u> <u>Everson v. Bd. of Educ.</u>, 330 U.S. 1, 15 (1947). Prisoners maintain their constitutional right to maintain their constitutional right to freedom of religion. <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987). Thus, "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2 (1972). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. <u>Hernandez v. Comm'r</u>, 490 U.S. 680, 699 (1989). A "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," or one that forces a person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on one hand, and abandoning her religion … on the other hand…." <u>Lovelace v. Lee</u>, 472 F.3d 174, 187 (4th Cir. 2006) (quoting <u>Thomas v. Review Bd. Of Ind. Employment Sec. Dev.</u>, 450 U.S. 707, 718 (1981); <u>Sherbert v. Verner</u>, 374 U.S. 398, 404 (1963)). A mere inconvenience to the exercise of religion fails to give rise to a First Amendment violation. <u>McEachin v. McGuinnis</u>, 357 F.3d 197, 203 n.6 (2d Cir. 2004). Moreover, *"[d]e minimis* burdens of the free exercise of religion are not of constitutional dimension." <u>Rapier v. Harris</u>, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (citations omitted).

A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." <u>O'Lone</u>, 482 U.S. at 349 (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)). In deciding

whether a policy can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89-90. Claims brought under the First Amendment are subject to a less demanding standard of proof than claims brought under RLUIPA, with RLUIPA claims requiring "strict scrutiny instead of reasonableness." Lovelace, 472 F.3d at 199 n.8; see Wright v. McCullough, 921 F.3d 413, 418 (4th Cir. 2019). To hold defendants liable as individuals under RLUIPA, a plaintiff must further prove that the defendants acted intentionally rather than negligently. Lovelace, 472 F.3d at 194.

RLUIPA and First Amendment claims proceed in two stages. "At the first stage, which is essentially the same for both claims, the plaintiff must show that the prison's policies imposed a substantial burden on his exercise of sincerely held religious beliefs." Wright, 921 F.3d at 418 (citing Carter v. Fleming, 879 F.3d 132, 139-40 (4th Cir. 2018). If the plaintiff can make that showing, we proceed to the second stage, asking whether the prison's policies are justified despite the burden they impose. The standards governing this second stage diverge for RLUIPA and First Amendment claims. Under RLUIPA, the government has the burden to show that its policy satisfies strict scrutiny: that is, the policies must represent the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a).

**(3)** **Due Process**

The Fourteenth Amendment's Due Process Clause provides that no person shall be

deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV. The first inquiry in any due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty that was accomplished by state action. Tigrett v. The Rector and Visitors of the Univ. of Va., 290 F.3d 620, 628 (4th Cir. 2002); Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988). "Unless there has been a 'deprivation' by 'state action,' the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to 'due process' is simply not implicated." Stone, 855 F.2d at 172. Moreover, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 328 (1986).

Where a state employee's random, unauthorized act deprives an individual of property, either negligently or intentionally, the individual is relegated to his state post-deprivation process, so long as the State provides an adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517 (1984); Parratt v. Taylor, 451 U.S. 527 (1981), *overruled on other grounds by* Daniels v. Williams, 474 U.S. 327 (1986)). However, post-deprivation remedies do not satisfy the due process requirement where the deprivation complained of is effected pursuant to an established state procedure rather than a random, unauthorized action. Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982).

Under North Carolina law, an action for conversion will lie against a public official who wrongfully deprives an owner of his property by an unauthorized act. Gallimore v. Sink, 27 N.C.App. 65, 67, 218 S.E.2d 181, 182 (1975). North Carolina's post-deprivation remedies are adequate. N.C. Gen. Stat. § 143-291; see Wilkins v. Whitaker, 714 F.2d 4, 6 (4th Cir. 1983) (due process satisfied where North Carolina tort law provides an adequate avenue for relief for state

prisoner).

**(4)  <u>Qualified Immunity</u>**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. <u>Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md.</u>, 999 F.2d 780, 784 (4th Cir. 1993) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in <u>Saucier</u> is "often appropriate," it is not mandatory. <u>Pearson</u>, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. <u>Id.</u>

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue

must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4ᵗʰ Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4ᵗʰ Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4ᵗʰ Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4ᵗʰ Cir. 2017); Owens, 372 F.3d at 279 ("the absence

of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

### III. DISCUSSION

### (1) First Amendment & RLUIPA

Defendants have presented evidence that Lanesboro SOP and NCDPS policies and procedures relating to inmate property were not promulgated with any intent to discriminate against Plaintiff or his religious faith but are necessary to maintain the safety of the inmates and officers in the facility. Defendants further presented evidence that Lanesboro SOP limits the number of items an inmate placed on Segregation/Control Unit can possess in order to limit the risk of fire and sanitation hazards due to cell size. Religious items are not prohibited by NCDPS policy or by Lanesboro SOP. While the limits on property amounts may make the practice of religion more difficult, they do not pressure a religious adherent to violate or abandon his religious beliefs and leave open alternate means of religious practice.

Plaintiff's Amended Complaint is refuted by the record insofar as he claims that he was only permitted to retain six books, (Doc. No. 13 at 4, 6, 8), whereas his own requests for relief indicate that he was permitted to retain eight books, (Doc. No. 50-5 at 1, 2, 4). The record also indicates that Defendants did not impose a substantial burden on Plaintiff's religious exercise. Defendants initially tried select the books that Plaintiff was going to keep but, when Plaintiff

complained, he was allowed to select the books he was going to keep. (Doc. No. 50-5 at 4). It was Plaintiff's decision to keep eight legal books and mail all of his religious books to his family because he was engaged in litigation[3] and the legal books were "quite costly." (Doc. No. 50-2 at 18). Defendants afforded Plaintiff a reasonable opportunity to practice his religion by allowing him to decide whether to retain some or none of his religious books and did not impose a substantial burden on him under these circumstances. See, e.g., Neal v. Lewis, 414 F.3d 1244 (10th Cir. 2005) (defendants did not violate plaintiff's First Amendment rights by simply enforcing a prison regulation limiting the number of books he could keep in his cell; nothing prevented plaintiff from stocking his cell with religious texts up to the 12-book limit). As the decision to forego all religious books in order to comply with the personal property limit was Plaintiff's own decision, Defendants are entitled to judgment as a matter of law. To the extent that Plaintiff asserts a cross-motion for summary judgment, it is denied because he has failed to demonstrate that he is entitled to judgment as a matter of law.

Moreover, RLUIPA does not permit Plaintiff to recover damages because a state's Eleventh Amendment immunity from suit for damages is not waived in RLUIPA. See Madison v. Commonwealth of Va., 474 F.3d 118 (4th Cir. 2006). Although non-monetary relief is available under RLUIPA, such a claim is moot because Plaintiff no longer resides at Lanesboro C.I. and he cannot be returned to that facility as Lanesboro has been converted to Anson C.I., a women's prison.[4]

**(2)** **Due Process**

---

[3] Plaintiff specifically states in his Response to the Motion for Summary Judgment that he "doesn't allege violation of access to the courts," (Doc. No. 50-2 at 19), and he does not allege that he required all of the legal books to prosecute his ongoing legal actions.

[4] See https://www.ncdps.gov/adult-corrections/prisons/prison-facilities/lanesboro-correctional-institution; Fed. R. Ev. 201.

Plaintiff argues that Defendants violated due process by failing to honor his right to possess or store legal materials, which in, turn forced him to relinquish his religious books which were held from February 28, 2015 and April 8, 2015 and then mailed out to Plaintiff's family. He argues that the dispute about his legal materials should have been referred to the Director of Prisons and could have been resolved before his books were mailed out.

Plaintiff's allegation that Defendants deprived him of property contrary to established NCDPS Policy and Lanesboro SOP is unauthorized act which can be remedied under North Carolina's post-deprivation remedies. Because an adequate avenue for relief exists, due process is satisfied. Defendants will therefore be granted summary judgment on the due process claim.[5]

### (3)  Qualified Immunity

Defendants have asserted a qualified immunity defense which Plaintiff has failed to overcome by showing facts that make out a violation of a clearly established constitutional right at the time of the Defendants' alleged misconduct.

It is clearly established that prisoners have a First Amendment right to practice their religion. However, Plaintiff provides no legal authority for the proposition that his religious rights are violated by imposing a limit on the number of books he can possess at one time, including religious books. To the contrary, such limits are common in the Bureau of Prisons and various state prisons, which is indicative that such right is not clearly established. See, e.g., Seamons v. Ramirez, 2018 WL 1583139 (D.Id. March 30, 2018) (noting that a prison protocol limiting the number of books in a prisoner's possession at one time of five is consistent with the Federal Bureau of Prisons' policies and other prisons' similar policies). Plaintiff admitted in his written requests

---

[5] Plaintiff states that such a claim would be barred by *res judicata*, which suggests that he has already availed himself of the remedy available in the state courts.

submitted to the prison that Defendants allowed him to select the eight books that he was allowed to keep in his cell, all of which were legal texts. No clearly established law required Defendants to insist that Plaintiff select a combination of legal and religious texts to retain in his cell, in fact, he argued with staff to retain only legal books. A reasonable prison guard would not have known that permitting Plaintiff to select the books to retain in his cell would have violated his clearly established rights. Defendants are therefore entitled to qualified immunity on Plaintiff's claims for damages against them in their individual capacities.

**(4)** **Pending Motions**

Plaintiff's Response includes a cross Motion for Summary Judgment, a Motion seeking reconsideration of his motion for the appointment of counsel, and a Motion for copies of some materials he filed with the Court.

As a preliminary matter, the Court notes that these Motions fail to comply with the Court's local rules. See LCvR 7.1(c)(2) (motions are not to be contained in responsive briefs). Even if they were properly filed, these Motions do not warrant relief. Plaintiff has failed to demonstrate that he is entitled to judgment as a matter of law or the existence of exceptional circumstances that would warrant the appointment of counsel. Nor does the Court have any obligation to provide Plaintiff with copies of any materials in the Court's file. However, the Court will order the Clerk of Court to forward Plaintiff a copy of his Response materials as a courtesy. (Doc. Nos. 50, 50-2, 50-3, 50-4).

## IV. CONCLUSION

Based on the foregoing, Defendants Lee, Mitchell, and Williams' Motion for Summary Judgment is granted,[6] the Motions incorporated in Plaintiff's Response are denied, and this case

---

[6] Because service was never accomplished on Defendant Horne or the Unidentified Unit Manager, they will

will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion to Amend/Correct the Motion for Summary Judgment, (Doc. No.

   43), is **GRANTED**.

2. The Motions incorporated in Plaintiff's Response, (Doc. No. 50), are DENIED.

3. The Clerk of Court is instructed to mail Plaintiff a copy of docket numbers 50, 50-2,
   50-3, and 50-4.

4. TThe Clerk of Court is instructed to close this case.

Signed: August 14, 2019

Frank D. Whitney
Chief United States District Judge

---

be dismissed from this action. <u>See</u> Fed. R. Civ. P. 4(m). Defendant Tillman will also be dismissed from this action because, although he was served but never filed an Answer, no default or default judgment was ever entered against him. Even if the foregoing Defendants had been properly served and filed answers, they would be entitled to summary judgment for the same reasons as the moving Defendants.